Pages 1-21

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                      (SAN DIEGO)

4

5   TOBY HOY, individually and on    ) Case No.  22-cv-00151-LL-MDD
    behalf of all others similarly   )
6   situated,                        ) San Diego, California
                                     ) Wednesday, May 25, 2022
7             Petitioner,            ) Courtroom 2C
                                     )
8        v.                          )
                                     )
9   ZEETOGROUP, LLC,                 )
                                     )
10            Respondent.            )
    _____ )
11

12

13              TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE MITCHELL D. DEMBIN
14             UNITED STATES MAGISTRATE JUDGE

15  APPEARANCES:

16  For Plaintiff:              BENJAMIN M. DRACHLER, ESQ.
                                Terrell Marshall Law Group PLLC
17                              936 North 34th Street, Suite 300
                                Seattle, Washington 98103
18                              (206) 816-6603

19  For Respondent:             JACOB A. GILLICK, ESQ.
                                DANIELLE R. PENA, ESQ.
20                              Morris Law Firm, APC
                                501 West Broadway, Suite 1480
21                              San Diego, California 92101
                                (619) 826-8060

22

23

    [Additional Counsel Listed on the Following Page]
24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

2

```
1   APPEARANCES:  (Cont'd.)

2   For Miscellaneous Party        PAUL A. ROSENTHAL, ESQ.
    Hi.Q, Inc. doing business as   Kelley Drye & Warren LLP
3   Health IQ:                     One Jefferson Road, 2nd Floor
    (via Videoconference)          Parsippany, New Jersey 10178
4                                  (973) 503-5900

5   Transcription Service:         Peggy Schuerger
                                   Ad Hoc Reporting
6                                  2220 Otay Lakes Road, Suite 502-85
                                   Chula Vista, California 91915
7                                  (619) 236-9325

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1   <u>SAN DIEGO, CALIFORNIA  WEDNESDAY, MAY 25, 2022  1:28 P.M.</u>

2                            --oOo--

3          THE CLERK:  Please remain seated and come to order.

4   This Court is now in order, the Honorable Mitchell D. Dembin now

5   presiding.   We are on for an oral argument hearing.   Calling

6   Matter Number 1, Case Number 22-cv-151, Hoy v. ZeetoGroup.

7   Counsel, please state your name for the record.

8          MR. GILLICK:  Good afternoon, Your Honor.   Jacob

9   Gillick appearing on behalf of ZeetoGroup.

10         THE COURT:  Great.

11         MR. GILLICK:  To my right is Danielle Pena.

12         THE COURT:  Thank you.

13         MS. PENA:  Thank you.  Good afternoon.

14         MR. DRACHLER:  Good afternoon, Your Honor.   Ben

15  Drachler on behalf of Petitioner Toby Hoy.

16         THE COURT:  Thank you.  And do I have anybody

17  appearing on behalf of --

18         MR. DRACHLER:  Yes.  Mr. Rosenthal is here on the

19  screen.

20         THE COURT:  Oh, here he is.  Great.

21         MR. ROSENTHAL:  Yes.  Good afternoon, Your Honor.

22  Paul Rosenthal appearing for Hi.Q, Inc. dba Health IQ, and thank

23  you again for allowing us to participate remotely.

24         THE COURT:  Well, you're not a party to this

25  proceeding, and I suppose I could have ordered you here.  I'm not

4

1   really sure that it would have been the right thing to do.  But I

2   asked that you attend because it seems clear to me that you have

3   an interest in the outcome of this particular proceeding.  And I

4   was not prepared to rule on the papers on this thing.  There are

5   some questions that I have, some clarifications that I need.  And

6   to understand what I intend to do is I would like for us to find

7   a solution.  I -- magistrate judges like to be problem solvers.

8   At this stage of my career, I don't need to write another lengthy

9   discovery order.  I've done it in the past, you know.

10          But it seems to me that this -- this matter -- I think

11  there is -- should be mutual interest -- and when I say "mutual,"

12  all three -- in getting -- finding a legitimate, practical

13  solution.

14          So let me just give you some -- some of my preliminary

15  thoughts.  And I'm going to at various times ask you to -- I'll

16  stop and say, "Am I right so far?"  Because first I want to do

17  sort of a general big picture of what I see and then start getting

18  into the nitty-gritty of where I think we need to go.

19          So, of course, this is a TCPA case pending in the

20  Northern District.  It is a putative class action at this point

21  alleging that the Defendants contacted by phone -- calls or texts

22  -- individuals without having previously -- those individuals

23  having not expressly consented to those calls.  I appreciate that

24  the Defendants may have other defenses, but the issue of consent

25  generally is an affirmative defense in these cases and, in my

5

1   view, that's always a critical -- there's two issues always in

2   these cases -- the use of an auto-dialer, whatever that means --

3   as the definition seems to have changed over time -- and the other

4   one is the question of consent.

5           Here, we're focused on the question of consent.  It

6   seems that Hi.Q did in fact call and text persons, including the

7   class rep, the putative class rep Mr. Hoy.  And the issue as the

8   rabbit hole, I suppose, is where did these leads come from and who

9   along the line obtained what they think is an appropriate consent

10  for these calls?

11          I appreciate, from reading the papers -- you know,

12  Item 1 is that it appears that there's evidence that Hi.Q obtained

13  at least some of the names of the people they called through a

14  group they've identified as Cege, C-e-g-e.  One question for later

15  is whether or not that -- that the -- whether the universe we're

16  talking about are people that were -- that were -- whose names

17  were in the tranche of leads provided by Cege or whether Hi.Q

18  contacted others, that there were other lead sources.  That I

19  think is a question for later.

20          But, first, Hi.Q contacted people based on leads that

21  it obtained from its vendor, Cege.  There is some question as to

22  whether Cege is or is not the same company as Policysmart -- is

23  that --

24          MR. GILLICK:  Policyscout?

25          THE COURT:  Policyscout, yeah.  I -- it may or may not

6

1  be.

2          MR. DRACHLER:  You know, Your Honor, I think they are

3  actually all DBAs of the same --

4          MR. GILLICK:  Yes.  That's my understanding, too.

5          MR. DRACHLER:  Yes.  I believe they're all the same.

6          THE COURT:  That's -- that's helpful because I wasn't

7  entirely -- entirely sure.  And then looking further down the

8  chain, what it appears to me is that the leads that Cege or

9  Policyscout sold to Hi.Q, at least some of them -- maybe all --

10 were obtained as a consequence of a project that it engaged I'll

11 call -- I'll call ZeetoGroup -- I'll call it Zeeto, even though

12 it's clearly -- it's probably the GetItFree collection of

13 websites, but for -- I can call it Zeeto or GetItFree.  It really

14 doesn't matter to me.

15         But there was a campaign in which Zeeto or GetItFree

16 was engaged by Policyscout to generate leads and those leads were

17 generated and provided to Policyscout which ultimately were

18 provided in some measure or form to Hi.Q.  So -- and, again, this

19 is more high level -- somewhere along the line, alleged consents

20 were obtained for these leads to be contacted either by email or

21 by call or text.

22         It appears from the fact that we're here that the

23 campaign that Zeeto ran for Policyscout resulted in information

24 that Zeeto it can get that is with a third party called Jornaya in

25 which the evidence of consents is located.  Presumably, it is

7

1    Zeeto that contracted Jornaya and it's one of the -- that's where

2    I start losing the thread, which is how -- how does the

3    consents -- how do they get into Jornaya's hands and who has

4    access to them?

5               MR. DRACHLER:  My understanding -- and for Mr. Gillick

6    and maybe Mr. Rosenthal can speak to this more -- but my

7    understanding is that Jornaya ports are created by a code that is

8    actually placed directly on Zeeto's websites.  So what we believe

9    Zeeto has -- and we haven't been able to -- they haven't engaged

10   with us in terms of finding out what they actually have in their

11   possession, but what we believe they have is the underlying code

12   and the images of the web form --

13              THE COURT:  Oh, stop all that for a moment.

14              MR. DRACHLER:  Yes.

15              THE COURT:  Because, honestly, I don't care --

16              MR. DRACHLER:  Okay.

17              THE COURT:  -- about the web forms and the like.  What

18   I care about -- and I think the Plaintiff and Defendant care about

19   -- is what is the evidence of consent?  Is there express consent

20   to be contacted by phone or text by a specific entity, here Hi.Q?

21   All the background information is, in my view, not relevant.  The

22   question is does Jornaya have that evidence and, based upon the 26

23   samples that we reviewed, there is evidence of that there was

24   either consent or lack of consent contained within the records of

25   Jornaya.

8

1          MR. DRACHLER:  Yes, Your Honor, but I would just say

2     I also think that Zeeto has in its own personal possession,

3     outside of what these Jornaya reports are, that it has some

4     additional information in its own possession and I think that is

5     reflected in the fact that, you know, in Mr. Cardwell's

6     declaration he says, You know, I looked through these coding logs

7     that we have and these coding logs show that Health IQ was never

8     added -- or, excuse me -- was never removed from the list of

9     marketing partners.

10          THE COURT:  Again, we're going into a rabbit hole I

11     don't intend to get into.  We have -- we have a collection of data

12     apparently in the hands of Jornaya -- and Zeeto has access to it,

13     obviously, since they produced the 26.  And my question has to do

14     with the information that goes to Jornaya, is it identified by a

15     particular campaign so that the campaign that Zeeto engaged in on

16     behalf of Policyscout, has that been filed within the records that

17     Jornaya is holding of consent for Zeeto?

18          MR. DRACHLER:  My understanding is that --

19          THE COURT:  Well, let me -- it may be a -- yeah.  I

20     appreciate what you think and that's all fine, but we -- I want to

21     talk in the realm of what is, not what may be.

22          MR. GILLICK:  Thank you, Your Honor.  So my

23     understanding -- do you mind if I stand?

24          THE COURT:  No.  You should be.  It's federal court.

25     I tend not to insist on it, but --

9

1              MR. GILLICK:  Thank you.

2              THE  COURT:   -- some  of  my  colleagues  would  be

3      different.

4              MR.  GILLICK:   Thank  you,  Your  Honor.   So  my

5      understanding of the Jornaya reports is that they go through the

6      code and we generate the imagery that was -- that was seen when

7      the consumer was entering their information and providing consent

8      to be contacted.  I am not a hundred percent sure if Jornaya can

9      do it by campaign.  I know there are other identifying factors.

10     For -- for what we did for these 26 reports is we did it by

11     telephone numbers and, you know, go back and that's how Jornaya

12     recreates these reports.

13             THE COURT:  And that may be -- I'm going to stop you

14     there for a moment because what I'm -- what I'm leaning toward is

15     a way that we can get to the consent information, such as it is,

16     for individuals actually contacted by Hi.Q based upon leads that

17     originated  from  this  --  from  this  campaign  on  behalf  of

18     Policyscout.   So  that's  really  an  important  question  that

19     hopefully is going to yield an appropriate answer that is we can

20     identify -- this is what I'm hoping for -- we can identify the

21     phone numbers of people contacted on behalf of Hi.Q based upon

22     leads that we can demonstrate were generated through this campaign

23     by Zeeto with Policyscout.

24             And in some --

25             MR. ROSENTHAL:  Your Honor, --

10

1          THE COURT:  Yes.

2          MR. ROSENTHAL:  Oh, I'm sorry.  If I may --

3          THE COURT:  Oh, of course you may.

4          MR. ROSENTHAL:  -- and I'll stay seated, Your Honor,

5    so you don't have to stare at my legs on the camera.  But --

6          THE COURT:  Assuming you were in pants.

7          MR. ROSENTHAL:  -- every -- yeah.  Yes, Your Honor.

8    Each lead that's -- that is generated with the Jornaya software

9    actually has a unique identifier, an alphanumeric code that is

10   affiliated with that lead and with that -- with that sort of

11   recreation of the customer experience so that you could go back

12   from each individual lead and find the report and the data that

13   would be associated with that particular consumer that was -- that

14   was passed from Zeeto to Cege to help Health IQ.

15         THE COURT:  Right, but my concern was not with

16   identifying every lead that was generated.  I want to try and

17   limit the universe, to a certain extent, to folks actually called.

18   The fact that there was a lead generated is not really terribly

19   important.  The issue is can we identify the folks that were

20   actually called or texted, those numbers.  Can we identify those

21   or have they been identified already?

22         MR. ROSENTHAL:  Yes.  The telephone -- the telephone

23   records were identified and it was narrowed down to the -- to just

24   the people who were -- who were called that are at issue.

25         THE COURT:  Okay.

1           MR. ROSENTHAL:  The other limiting starting factor may

2   be -- and I don't think that this has ever been confirmed -- is if

3   we knew the date when Health IQ was identified on the -- on the

4   website for GetItFree, then that may provide us some context.

5   Right?  If it was never removed and we need a date that it was

6   added, that would be a helpful data point I think for everybody.

7           THE COURT:  Well, again, I'm trying to make this --

8   as  part of my job -- and because we're dealing with a Rule 45

9   situation, part of my job is to, one, get the parties -- because

10  I do think there's mutual interest in this -- and we can talk

11  about what that means -- get the parties what they need, which is

12  the evidence of consent, such as it is, regarding individuals

13  actually contacted by phone or mail -- by phone or text by Hi.Q to

14  get the -- get that consent information in a way that minimizes

15  the burden on ZeetoGroup but gets folks what they need.

16          So one way to do that, assuming we have a universe of

17  phone numbers of people actually called by Hi.Q, called or texted,

18  well, that's awesome.  Then we should be able to extract from the

19  Jornaya database this digital information regarding the engagement

20  with that customer by Zeeto.  Right?  We should -- we should be

21  able to get that.

22          The question is:  How many are there and, two, how do

23  we get it so that the parties -- and I think the parties would

24  jointly have an interest in this -- where the parties can explore

25  it to their hearts' content.  You know, we -- we received the 26

1  samples that were provided.  There were links to that information.

2  We checked the links.  We had mixed results regarding the links,

3  but that's a different situation.  But it seems to me if we can

4  identify the phone numbers, turn those into links that are

5  available to both parties -- right? -- to Hoy as well as Hi.Q --

6  we can cut Zeeto out of this mix because then all that matters is

7  what's in those files.  You know, I'm not going to talk about

8  necessarily my review of that information, but obviously it

9  provides material information to both parties regarding the issue

10  of consent.  And it seems that both parties should have an

11  interest in having access to that same universe of data and making

12  of it what it will.

13              The question is how do we get that information from

14  Jornaya through Zeeto -- 'cause I guess that's where the contract

15  is -- without too much muss or fuss?  Can we generate a list of

16  phone numbers which turns into -- with some effort, I suppose --

17  a list -- links associated with each number that the parties can

18  have access to in some, you know, database somewhere.  I would

19  need to know how tough that is and what the cost of that would be.

20  Because, in the end -- even though we have a few more things to

21  talk about, in the end, that's what matters here -- which is

22  Plaintiff wants the evidence as much as the Defendant does as to

23  whether these consents are good consents or not good consents,

24  give them something to argue about.  It narrows the scope of the

25  case.  It may have a bearing on class certification.  And it seems

1    like that is my job -- is to get that information out of Zeeto's

2    hands and take them out of the mix.  But they have to be involved

3    because they have to get the information from Jornaya for you,

4    apparently -- get that in a set of links that you both have access

5    to and off you go.

6            That's -- that's my plan and I want to figure out how

7    we can accomplish that.

8            MR. ROSENTHAL:  And, Your Honor, it -- it is possible

9    to do it based on, to the extent they're available, the offering

10   in that code rather than just the telephone number.  That will be

11   a much more precise targeting of the Jornaya data because if

12   somebody with the same telephone number goes three different

13   times, we need to know which of those three leads was the one that

14   actually made its way to Health IQ and that can make a difference

15   because the user experience we understand is dynamic.  And so it

16   doesn't always look -- the website doesn't always look the same.

17   And if they visited on three different days, we need to know that

18   we're looking at the right lead back and that's only available

19   through the alphanumeric code, I believe, and not just through the

20   telephone number.  And that may be what has led to some of the

21   disconnect.

22           THE COURT:  Well, and here's what I -- my end game is

23   -- and I kind of tend to do this -- I'm a bottom-line guy -- what

24   I would really like to have happen here is for counsel for Zeeto,

25   counsel for Plaintiff, counsel for Defendant to actually have a

1    meaningful conversation and decide what can be done expeditiously,

2    efficiently, and perhaps with some level of cost-sharing which,

3    you know, we can -- we can work out to get this information, which

4    is critical -- critical -- into the hands of the parties who need

5    it, which is both Plaintiff and Defendant.

6         That's what I'd like to see happen.  I don't imagine

7    there can be a strong opposition to this, Zeeto.

8         MR. GILLICK:  No, Your Honor.  We're very happy -- I

9    think you've got a good understanding, a great understanding of

10   the case and the facts, and I think this is a good road map to try

11   and get together.  It was -- it was just so overbroad that we

12   needed to narrow everything down.

13        THE COURT:  Well, I agree.  I mean, there were two

14   problems with the submissions I received.  I do -- I do believe

15   that the information requested by the Plaintiff, considering the

16   nature of the case, was overbroad.  It has to be relevant to a

17   claim or defense.  I don't see at this point that Zeeto's business

18   practices, GetItFree's contracts, none of that -- the policies are

19   kind of not relevant anymore.  The issue is these consents.  This

20   is what you want.  I don't know that you need anything else from

21   Zeeto except unfettered access, right? -- not strictly through

22   Zeeto but unfettered access to this consent file.  And whatever it

23   is, it is.  It's -- I suppose, based on what I saw, it would both

24   help and hurt you, but that's helpful, in any event.  And I think

25   that's what you need.  And I think both parties need it.  So I

1    think that there's a way to do it.

2           I don't see any need for a deposition, at least at

3    this stage.   I think all that we need is Jornaya data file

4    contains the purported consents.   And they are what they are.   I

5    appreciate some of Plaintiff's speculations that maybe there's

6    been manipulation, but there's no evidence of that, at least none

7    that I find persuasive and that not going to justify the kind of

8    expedition we see here.   What would Zeeto's -- it's hard -- what

9    would Zeeto's motivation be?   Their client was not Hi.Q.   Their

10   client was Policyscout.

11          So I really -- I don't -- I'm not allowing Plaintiffs

12   to go down that path.

13          But I think what -- I think everybody's happy -- at

14   least as happy as they're going to get -- if I can get these

15   consents into the hands of both the Plaintiff and Defendant, get

16   these links out there -- some will work, some will not.   We

17   already know that.   But the majority of them worked.   And I'll

18   tell you that my review, in some of them the email consent was

19   clear but the text and call consent was not.   And I think you've

20   already seen that in the 26.

21          But sampling isn't going to work here.   I think it has

22   to be a more gross approach, I think, and that's -- that burden

23   needs to be on the Plaintiff and on the Defendant to figure out

24   what's there and what helps them and what hurts them so that they

25   can fashion both a class certification argument and counter, as

16

1   well as have a discussion about the merits.  There may be other

2   issues in the case, but certainly consent is critical.  And that's

3   what I want to accomplish.

4        I'll let you argue for whatever else you think you

5   want -- you're going to get.  It's not going to be likely, but --

6   because I think we need this consent and we don't want to bog this

7   down with some of these other issues.

8        Now, it may be that some time in the future as this

9   case inches along, there may be a need for something further from

10  Zeeto, so I'm not going to close the door, but I do think -- I

11  will order that Zeeto cooperate with Plaintiff and I'd like Hi.Q

12  to cooperate, although my ability to order you to do anything is

13  limited, but I think it's in your interests to cooperate in terms

14  of coming to a solution about how to get this data related to the

15  calls made by Hi.Q -- calls/texts -- track them back to Jornaya,

16  get that data for each of you.  I want you to find a way to agree

17  to that -- to that process.

18        Everybody okay with that concept?

19        MR. GILLICK:  Yes, Your Honor.

20        MR. ROSENTHAL:  Yes, Your Honor.

21        MR. DRACHLER:  Yes, Your Honor.  In concept, yes.

22        THE COURT:  All right.  I mean, you know, the devil

23  is in the details.  I appreciate that.  What I propose to do is

24  give you a few weeks to try and work something out and then we can

25  have -- I don't know that I'll bring everybody back into court.

17

1   We could do it by telephone.  But I wanted us to have more of an

2   open discussion -- although it's been me mostly monologuing and I

3   apologize -- but I want to move it along.

4           The -- I think we can have a talk -- I don't know if

5   it's two weeks, three weeks, whatever you want -- that it makes

6   sense for you to figure out how you get what you need, what the

7   burden is on Zeeto, how we can minimize that burden, and get you

8   the information as soon as possible.  The sooner you have it, the

9   better.  Because it's going to take time to go through this stuff

10  and figure out what it is and isn't, whether these consents are

11  good consents or not good consents.  And, again, I'm not

12  expressing any opinion on that.  But there's room for argument on

13  both sides of this thing.

14          But you have to have the information.  That's --

15  everything else I think is really not important.

16          MR. DRACHLER: And I think -- I'll stand here.  Sorry.

17  I think, you know, your approach makes sense and I think, you

18  know, one of the things that would be helpful to have -- and we

19  can talk about this in terms of -- when we get together -- is what

20  Mr. Rosenthal spoke about is when Health IQ -- when Hi.Q was added

21  to this marketing partners' list.

22          THE COURT:  I -- that should not be an issue.  That

23  really shouldn't be an issue.  I actually -- we're in a situation

24  where there has to be cooperation.  Zeeto is -- the benefit to

25  Zeeto is they're not going to bear this expense of going through

18

1    each of these thousands of leads to figure out what they are.

2    They're going to be identified for Zeeto -- they have to pull

3    these things, pull the links and get them to both of you in

4    some -- in some way.  But, yes, so I agree that anything that

5    causes us to focus in instead of out is of great value, so I agree

6    with you.

7              MR. GILLICK:  I agree with that, Your Honor.  That's

8    something we can work towards and get that accomplished as well.

9              THE COURT:  The question is how much time do you need?

10   Do you have any idea?  Is it two weeks, is it three weeks, is it

11   a month?  I mean, I -- it doesn't matter to me.  I just want it

12   moving along.

13             MR. DRACHLER:  Your Honor, I think three, four weeks

14   is probably enough.  I don't know what you think, Mr. Rosenthal.

15   I don't know what your schedule is, but I can probably see four

16   weeks is enough for us to get together and try and work something

17   out.

18             THE COURT:  Mr. Rosenthal?

19             MR. ROSENTHAL:  Yeah.  I think -- I think that should

20   be fine.

21             THE COURT:  Good.

22             MR. ROSENTHAL:  That timing would be fine, and we're

23   happy to work with everybody to get this through as efficiently as

24   possible.  There's -- there's currently a discovery close in the

25   underlying case, but I think the parties can -- can address that

19

1  together and with the court, with the Northern District on the

2  impact of that.

3          THE COURT:  Well, yeah.  I mean, to the -- and I'll

4  help to the extent you need my help on that.  You know, it's

5  pretty clear that you have to get access to this information, and

6  all we're doing is figuring out how to do it in a way that

7  minimizes the burden on the third party but maximizes the

8  information you get in terms of the issues in the case.

9          So why don't we -- let's pick a date about 30 days --

10  what my intention is to set a telephonic conference.  It will be

11  at 9:15 in the morning.  We'll give you the call-in information.

12  It will be on the docket in our Rule 45 case.  What do I have in

13  about a month?

14      (Asides between the Court and the Clerk.)

15          MR. GILLICK:  Your Honor, if I may suggest something?

16          THE COURT:  Sure.

17          MR. GILLICK:  I'd be happy to put together just a

18  small brief before the hearing, whenever you want, just letting

19  you know how the updates went, if that helps with your calendar

20  and timing.

21          THE COURT:  It -- not necessarily.  I mean, I -- I

22  would love for you to call in and say, We've resolved everything.

23  Your motion is moot.

24          MR. GILLICK:  Me, too.

25          THE COURT:  That would be awesome.  Recognizing

1  that -- that's what I'm trying to accomplish here, as I said.  I

2  don't want to have to rule on each specific topic.  There's no

3  point.  What you need is the consents.  Period.  And that's what

4  you're going to get, whether by order or otherwise.  And I just

5  want to make sure we're -- we need a date because that's what gets

6  people to work.

7          (Asides between the Court and the Clerk.)

8                  THE COURT:  So we can do it at -- how about 1:30 in

9  the afternoon on Wednesday, the 22nd of June?  Does that work for

10  people?  It will be as short a conversation as it needs to be for

11  you to tell me where you're at or whether there's an issue I need

12  to resolve.

13                  I suspect -- I don't see any reason why you can't

14  resolve this.  I really don't.

15                  MR. GILLICK:  Agreed.

16                  THE COURT:  It's in everybody's interest to get this

17  resolved without too much muss or fuss.

18                  MR. GILLICK:  We are -- Zeeto's available on the 22nd.

19                  MR. DRACHLER:  Yes.  I believe we'll be available --

20  someone on Plaintiff's side will be available on June 22nd.

21  Likely it will be me, but I can --

22                  THE COURT:  We'll do it by phone so, you know, I'm not

23  going to force people back in, but I wanted to see you at least

24  for the initial hearing to get your sense as to where I was going

25  with this.

21

1          Mr. Rosenthal, are you okay on that date?

2          MR. ROSENTHAL:  Yes.  Thank you, Your Honor.

3          THE COURT:  All right.  I'll get that order out and,

4   for the time being, I will hold this motion in abeyance pending

5   the outcome of your discussions and hopefully lead to mooting it.

6          MR. DRACHLER:  Thank you, Your Honor.

7          MR. GILLICK:  Thank you, Your Honor.

8          MS. PENA:  Thank you, Your Honor.

9          THE COURT:  Thank you, all.

10         MR. ROSENTHAL:  Thank you, Your Honor.

11         MR. GILLICK:  Have a great day.

12      (Proceedings adjourned at 1:57 p.m.)

13

14         I, Peggy Schuerger, certify that the foregoing is a

15   correct transcript from the official electronic sound recording

16   provided to me of the proceedings in the above-entitled matter.

17

18   _____/S/ Peggy Schuerger_____        November 2, 2022
     Signature of Approved Transcriber      Date

19
     Peggy Schuerger_____
20   *Ad Hoc Reporting*
     Approved Transcription Provider
21   for the U.S. District Court,
     Southern District of California

22

23

24

25